

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| § | | |
| DEBORAH J. GREER, DIANA | | No. 08-15-00040-CV |
| ELIZABETH MACY, MARVIN § | | |
| GREER, JR. AND MAP2004, LLC | | Appeal from the 143rd |
| D/B/A MAP2004-OK, WOLF BONE § | | |
| RANCH PARTNERS LLC, SAPPHIRE | | District Court |
| ROYALTIES, INC., STEPHEN § | | |
| FLANAGAN, TRUSTEE OF THE | | of Reeves County, Texas |
| MIDLAND TRUST, JOHN G. § | | |
| HARPER, JOHN P. WANDEL, JR., | | (TC # 13-08-20458-CVR) |
| MAGNOLIA ROYALTY COMPANY, § | | |
| INC., WP RANCHES FAMILY | | |
| LIMITED PARTNERSHIP, J.M. § | | |
| MINERAL & LAND CO., GLML | | |
| INVESTMENTS, LTD., SHAWN P. § | | |
| HANNIFIN, FRANCES A. HANNIFIN, | | |
| FALL RIVER RESOURCES, INC., § | | |
| STRATA MINERALS, INC., CHRISTA | | |
| I. LEAVELL AND T-BAR OIL AND § | | |
| GAS LTD. AND REG M. DAY, AS | | |
| TRUSTEE OF THE DAY FAMILY § | | |
| TRUST, SHARON M. STROMBERG, | | |
| PATRICIA MURPHY, ARLENE M. § | | |
| MURPHY, TRHUSEE OF THE JOHN | | |
| TIMOTHY MURPHY, SR., § | | |
| REVOCABLE TRUST, ELIZABETH | | |
| FOLEY RAPE, TRUSTEE OF THE § | | |
| TESTAMENTARY TRUST F/B/O | | |
| WHITNEY ELIZABETH RAPE § | | |
| UNDER THE WILL OF JOHN DAVID | | |
| RAPE, MARGARET JUSTINE § | | |
| BALLANTYNE, ELIZABETH ANN | | |
| MARTIN, FFF, INC., JOE MARVIN § | | |
| CAYTON, | | |

|  |  |
|---|---|
| Appellants, | § |
| v. | § |
| GLENN DAVID SHOOK, CHARLES JOSEPH BOYD, SARAH ANN LECLERQ, REBEKAH LELA PRINCE, TIMOTHY DAMRON BOYD, JONATHAN MARK BOYD, JUDITH AND RICHARD COTHRUN, TRUSTEES OF THE COTHRUN LIVING TRUST, RUTH DELL SOMMERS AND RUTH COTHRUN SOMMERS, TRUSTEES OF THE RUTH C. SOMMERS REVOCABLE TRUST, SHEILA LUCILE MCCREA, ESQ. ON BEHALF OF THE MARGUERITE A. MCCREA TRUST, AS CO-TRUSTEE, CARL A. CROWLEY, AS EXECUTOR OF THE ESTATE OF ANNIE LEE CROWLEY, CHRISTOPHER LANCE TRIGG, CECILY TRIGG ORTENBERG, CAMERON LEIGH TRIGG, LYNN D. HUGHES, FRAZEE D. ARLEDGE, JULIE D. CANON, MELANIE D. LEE, DONNA D. PEPPER, ROBERT HAILEY, BARRY LEE HAILEY, JOHN FORREST GRIFFIN AND JOHN W. BUSH, CO-TRUSTEES OF THE BUSH/GRIFFIN LIVING TRUST, DATED MAY 1, 1999, GWEDOLYN B. GELTEMEYER, JESS ST. CLAIR, GUARDIAN OF THE ESTATE OF SHARON B. ST. CLAIR, SYLVIA RAMONA BUSH AND PRIEST FAMILY LIMITED PARTNERSHIP, EDWARD LEE CLARK, AS EXECUTOR AND SOLE HEIR OF THE ESTATE OF CHOLE CLARK, VICTOR M. JOUFFREY, JR., HEIR TO THE ESTATE OF VICTOR M. JOUFFRAY, | § § § § § § § § § § § § § § § § § § |

2

DECEASED, AND EXECUTOR OF §
THE ESTATE OF VICTOR M.
JOUFFRAY, DECEASED, §
CHRISTINE JOUFFRAY, YAKKA II,
LLC AND YAKKA OPERATIONS, §
LLC, CHAD SMITH, MICHAEL
MCCREA, VICTOR CHASE §
MCCREA III, JEFFREY REESE
MCCREA AND CYNTHIA ANN §
MCCREA TRUEBLOOD, AS
CO-TRUSTEES OF THE BARBARA §
MCCREA TRUST, DESERT
PARTNERS V, L.P., JUDY W. §
OGILVY, AS HEIR AND MICHAEL
ALEX OGILVY, AS HEIR AND §
EXECUTOR OF THE ESTATE OF
ALEX OGILVY, DECEASED, ABH §
BAXTER, LP, RAY MORRIS, L.W.
BENNINGER, DAVE MOODY, J.W. §
KIRBY, W.B. PANKHURST,
GEORGE S. SALEH, R.W. PARKS, §
MARY KATHRYN ALLMAN, J.
WALLACE HAWKINS, J.L. FARB, §
I.E. HOOD, MAX MANUS, MARIUS
VILLARET, ANNIE LEE §
CROWLEY, JAMES W. SANDEFER,
W.H. LACY, IRVIN J. FARB, RUTH §
ROWLAND, W.L. GRAY,
KATHRYN BOURQUE, CLARENCE §
MOORE, LOUISE MOORE,
ROSALIE WILLIAMS, HARRIS §
CLANTON, JR., J.K. HAZLIP, JR.,
UNKNOWN HEIRS OF S.P. HAZLIP, §
UNKNOWN HEIRS OF PAULINE
RETHMEYER, PAUL CELINE §
ROBIN, OTEKA JUNE
MCFARLAND, AS EXECUTOR OF §
THE ESTATE OF CHARLES
"CHICK" FAIR, DECEASED, §
PATRICIA SHORTES DOYAL,
INDEPENDENT ADMINISTRATOR §
OF THE ESTATE OF JOHN OCIE
SHORTES, DECEASED, §
SAPPINGTON ENERGY

3

INTERESTS, LTD., RAY STOKER, § 
JR., EXECUTOR OF CLAUDENE 
STOKER'S ESTATE, BETTY SUE § 
ELLIOT, GREGORY EDDINGS, 
EXECUTOR OF DOROTHY § 
HEARN'S ESTATE, HARRIS 
ROBERTS FENDER, JR., MILAM § 
SONS' MINERALS, LLC, RETTA 
HAZLIP, CHRISTIAN C. WICHSEL § 
II, JAMES WALLACE HAWKINS, 

Appellees.

## **O P I N I O N**

In this permissive appeal we are asked to construe a 1927 mineral deed. The 1927 deed is only seven paragraphs long, and no party claims it is ambiguous. But, the parties have widely different interpretations concerning what interests the deed conveyed and the size of those interests. The Appellants are the successors in interest to Lynn Eddins, the original Grantor of the deed, and Appellees are successors in interest to John Borden, the original Grantee. On cross-motions for partial summary judgment, the trial court determined that Appellees, the Borden Successors, were entitled to a 1/2 floating royalty interest in any production on the land described in the deed. We affirm.

### BACKGROUND

Lynn Eddins owned thousands of acres of land in Reeves County. In December 1925, Eddins assigned John Ross the right to drill and produce oil and gas on 3,840 acres of Eddins' property (the "Ross Lease"). Under the Ross Lease, Eddins retained a 1/8 royalty interest in the production (a "one-eighth part of all oil produced and saved from said leased premises"). The Ross Lease was for a term of five years, or as long thereafter as oil and gas was produced on the land.

4

In 1927, Eddins executed a deed to John Borden, which conveyed certain mineral interests to Borden as "Grantee" on portions of Eddins' land, which were then subject to the Ross Lease. We set out the relevant portions of the 1927 deed, numbering the seven paragraphs for the sake of clarity:

1. THAT I, LYNN EDDINS . . . do grant, sell, convey, assign and deliver unto the said Grantee [John Borden], an undivided one sixteenth (1/16) interest in and to all of the oil, gas and other minerals in and under, and that [which] may be produced from the following described land situated in REEVES County, Texas, to-wit:

2. All of Sections No. Two (2), Eight (8), Ten (10), Fourteen (14), and Twenty Two (22) Block C-1, Public School lands, and containing 3200 acres, more or less,

3. Together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said land for oil, gas and other minerals, and removing the same therefrom.

4. Be it expressly understood between the parties that the vendor is the owner of all of the royalty and that the grantee is purchasing one half (1/2) of the royalty [] one half (1/2) of the minerals, produced in and from wells or other operations situated on the specific tract of land described in this instrument.

5. [S]aid land being now under an oil and gas lease executed in favor of John Ross, it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes one half (1/2) of all of the oil royalty, and gas rental or royalty due and to be paid under the terms of said lease.

6. It is understood and agreed that none of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to the said Grantee and in [the] event that the above described lease for any reason becomes cancelled or forfeited, then and in that event an undivided one sixteenth (1/16) of the lease interest and all future rentals on said land for oil, gas and other mineral privileges shall be owned by said Grantee, he owning one sixteenth of all oil, gas and other minerals in and under said lands, together with no interest in all future rents.

7. TO HAVE AND TO HOLD THE ABOVE DESCRIBED PROPERTY, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and his heirs and assigns forever…. And it shall never be necessary for said grantee or his assigns to join in the execution of any future leases made on said lands.

5

Borden thereafter transferred his interest in the 1927 deed to a corporation that he owned, Ventures, Inc., which in turn transferred its interest to an unrelated third-party, Cecil Cothrun, in 1948.[1] Since that time, the successors to both Eddins and Borden/Cothrun have made numerous conveyances of their respective interests in the deed.

Although it is unclear exactly when the Ross Lease expired, the parties agree that the Ross Lease expired at some point long ago, and that the successors to Eddins' interests (the Eddins Successors) entered into a lease with Patriot Resources, Inc., the current operator of numerous oil and gas leases on the mineral properties that are the subject of the 1927 deed (the "Patriot Leases"). The royalty interest under the Patriot Leases is currently 25 percent for most of the leases, and 24 percent for others. For purposes of clarity, we will simply refer to this as a 1/4 royalty interest.

In 2013, Patriot filed an interpleader action in the trial court, naming 80 defendants, 30 of whom were Eddins Successors, and 50 of whom were Borden Successors (successors in interest to Borden and Cothrun). Patriot asserted that the 1927 deed was ambiguous, and that it was unable to determine the interests owned by the Borden Successors under the terms of the deed. In particular, Patriot asserted that because there were conflicting fractions in the deed, it was not certain whether the Borden Successors were entitled to receive: (1) 1/16 of the total production in any lease on the property regardless of the size of the royalty interest set by the terms of the lease

---

[1] In 1948, Borden, Cothrun, and Eddins entered into two separate agreements in which they purportedly sought to clarify their respective intentions. A document entitled Royalty Agreement (signed by the original parties, Eddins and Borden, together with Borden's first successor, his own corporation, Ventures, Inc.) provided that the parties intended for Eddins to convey a "full, free one-sixteenth 1/16th ROYALTY INTEREST" to Borden, while another document entitled Supplementary Agreement (signed by Borden and Ventures Inc., and their successor in interest, Cecil Cothrun) provided that Cothrun was receiving a 1/2 floating royalty interest. In the Supplementary Agreement, Cothrun expressly stated that he was only claiming a 1/2 royalty interest in the estate rather than a 1/2 mineral interest. However, as the Borden Successors point out, the trial court did not base its decision on the 1948 agreements, and instead based its decision solely on its interpretation of the 1927 deed. Therefore, the issue of how the 1948 agreements may have affected the parties' interests is not properly before us in this limited appeal.

(*i.e.*, a 1/16 fractional royalty interest); or (2) 1/2 of the royalty interest set by the terms of any lease on the property (*i.e.*, a floating royalty interest), which, under the current Patriot Leases would have given the Borden Successors a 1/2 interest in the 1/4 royalty under those leases, or what would effectively amount to a 1/8 interest in the total production. Ultimately, the trial court allowed Patriot to deposit $306,887.38 into the registry of the court, and dismissed Patriot from the lawsuit, without prejudice.

Both the Eddins Successors and the Borden Successors filed various cross-claims seeking declaratory relief, asking the court to resolve the ownership interest in their favor. Subsequently, both the Borden Successors and the Eddins Successors filed cross-motions for partial summary judgment, seeking the trial court's ruling on how to interpret the 1927 deed.

Before focusing on the arguments made by the parties and the decision made by the trial court, we believe it would be beneficial to provide background on the nature of the mineral interests at stake in this case, and an overview of the manner in which courts have historically construed mineral deeds of this nature.

### The Nature of Mineral Interests

We start with a basic overview of the nature of mineral interests in general. An instrument conveying land in fee simple transfers both the surface estate and the mineral estate to the grantee, unless the instrument contains a reservation or expresses a contrary intention. *Hysaw v. Dawkins,* 483 S.W.3d 1, 9 (Tex. 2016). The mineral estate is composed of five severable rights, which may be conveyed in total or separately to a third party: (1) the right to develop (the right to explore and drill for minerals); (2) the right to lease, also known as the executive interest (the right to lease to an operator who will then explore and drill on the property); (3) the right to receive bonus

7

payments (payments typically given on the front end of a lease at the time of signing); (4) the right to receive royalty payments (payments for a certain percentage of any production on the land); and (5) the right to receive delay rentals (payments made to the royalty interest owner when there is a delay in the agreed-upon time in which production is to begin). *Id.*

The holder of the executive or lease interest enjoys the exclusive right to make mineral leases to an operator who will have the sole right to explore and drill for minerals on the land. *Id.* In Texas, a typical oil and gas lease conveys the mineral estate as a fee simple determinable estate to the lessee, with the possibility of reverter to the lessor as a future interest, and typically includes provisions for the payment of bonus payments and delay rentals to the lessor, as well as for the payment of a royalty to the lessor during the term of the lease. The royalty payments are typically expressed as fractions of an interest in the total production. *Id.* (citing *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991)). The lessor may convey any interests he retains to a third party, including the royalty interest, either in its entirety or as a fraction of the interest. *Id*; *see also Garza v. Prolithic Energy Co., L.P.*, 195 S.W.3d 137, 142-43 (Tex.App. – San Antonio 2006, pet. denied).

When a mineral estate is conveyed, the grantor may reserve any interest or fraction of an interest in the estate that he wishes to retain; however, the mineral interest conveyed, even if it is "shorn of the executive right and the right to receive delay rentals remains an interest in the mineral fee." *Garza,* 195 S.W.3d at 142. In other words, when a mineral interest is conveyed, even if the grantor reserves all but the royalty interest, it is still considered a mineral interest, even though the only practical effect of the conveyance is to give a royalty interest in the operator's production. *Id*.

8

The lease holder may decide to convey both an "undivided portion of the mineral estate and a separate royalty interest" in the same land, either in the same or in a separate instrument. *Hysaw,* 483 S.W.3d at 9. These two estates may be of equal size, or the lease holder may convey two interests of a different size. In other words, the lease holder may convey a royalty interest that is "larger or smaller than the interest conveyed in the minerals in place." *Id.*

## The Differing Royalty Interests

A conveyance of a royalty interest, standing alone, is non-possessory in nature. A party possessing only the royalty interest with none of the other mineral interests (*e.g.*, the right to lease, or to receive delay rentals or bonus payments), is referred to as a non-participating royalty-interest holder. *Id.* Royalty interests may be conveyed or reserved as a fixed fraction of total production, (also known as a fractional royalty interest) or as a fraction of the total royalty interest (also known as a "fraction of royalty interest" or, as we shall refer to it, a "floating" royalty interest). *Id.* The floating royalty interest varies in accordance with the size of the landowner's royalty. Thus, if a party receives a 1/2 floating royalty interest, the interest will be calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease. *Id.* For example, if a lease calls for a 1/8 royalty interest, such as the Ross Lease did, the holder of the 1/2 floating royalty would be entitled to 1/16 of the total production. However, if a new lease is later negotiated calling for a 1/4 royalty, such as the Patriot Leases, the 1/2 floating royalty owner's interest essentially expands, and the royalty owner would be entitled to 1/8 of the total production.

On the other hand, if the royalty is expressed as a fixed fraction, the grantee is always entitled to only that fraction of production, regardless of the royalty set forth in the lease. For example, a conveyance of a fixed fraction of 1/16 gives the grantee 1/16 of the production, which

9

remains constant, regardless of whether an operator's lease calls for the payment of a 1/8 or 1/4 royalty interest.

**The Double-Fraction Problem and the Legacy of the 1/8th Royalty**

As the Supreme Court recognized in *Hysaw*, the interpretation of a deed that uses a single fraction throughout to express the interests conveyed is a relatively simple matter. *Id.* (citing *Garrett v. Dils Co.*, 299 S.W.2d 904, 906 (Tex. 1957)). However, many older deeds, such as the 1927 deed under consideration, often contained seemingly conflicting fractions either in the same paragraph or in different paragraphs, as well as double fractions (such as 1/2 of 1/8). Because of this, over the years, Texas courts have been faced with recurring interpretive challenges in construing those deeds. *Id.* (citing *Garrett,* 299 S.W.2d at 906, and *Concord Oil Co. v. Pennzoil*, 966 S.W.2d 451, 452, 454 (Tex. 1998)). When a court is presented with conflicting or double fractions in a deed, the court's task is always to "discern the intent of the parties from the four corners of the document," and the court must "consider the entire instrument to determine what has been conveyed." *Concord Oil Co.,* 966 S.W.2d at 457.

In *Hysaw*, the Court explained that one of the reasons many older deeds, including those dating back to the 1920's, contained conflicting or double fractions was because when the deeds were drafted, the standard royalty in virtually all lease agreements was 1/8. Therefore, many older deeds expressed royalty interests in fractions of 1/8. Because many royalty interest holders believed their royalty interest would always be 1/8 and that the interest would never vary from that amount, a grantor would often use the "near ubiquitous" 1/8 fraction as a shorthand to express the royalty interest he was conveying, or in other words, as a "proxy" for his entire royalty interest. *Hysaw,* 483 S.W.3d at 9-11. For example, the grantor might use the double fraction 1/2 of 1/8, or

10

alternatively the single fraction 1/16, to express that he was actually giving the grantee 1/2 of his entire royalty interest. Under that interpretation, the grantee would be given a 1/2 interest, which would be applicable to any current and future leases, making it a floating 1/2 royalty interest. The Court noted that this notion has been dubbed the "legacy of the 1/8th royalty." *Id.* at 10.

This possibility did not take on any significance until later years when parties began negotiating leases with larger royalty interests, such as the 1/4 interest included in the Patriot Leases. When that occurred, it became important to determine whether the grantee using a double fraction, or a fraction that was a multiple of 1/8, such as 1/16, intended to give the grantee a 1/2 floating royalty interest in any royalty set forth in a lease, or whether the 1/16 was intended to be a fractional royalty interest that was fixed regardless of the royalty set forth in the lease. *Id.*

The Court in *Hysaw* noted that although "not inexorably so, the reality is that use of 1/8 (or a multiple of 1/8) in some instruments undoubtedly embodies the parties' expectation that a future lease will provide the typical 1/8th landowners' royalty with no intent to convey a fixed fraction of gross production." *Id.* Instead, the Court noted that there is otherwise "'little explanation' for the use of double factions [sic] to express a fixed interest absent a misunderstanding about the grantor's retained ownership interest or use of 1/8 as a proxy for the customary royalty." *Id.* at 10-11. However, if the language in a deed is otherwise clear, "the possibility that the parties were operating under the assumption that future royalties would remain 1/8 will not alter clear and unambiguous language that can otherwise be harmonized." *Id.* at 10.

**The Estate Misconception Doctrine**

The Court in *Hysaw* also discussed a related issue in double-fraction cases, known as the "estate misconception" doctrine, which applies to the mineral estate that a landowner retains when

he leases his land to an operator, known as the possibility of reverter. *Hysaw,* 483 S.W.3d at 10. When a landowner leases his land to an operator, it is typically through a conveyance of fee simple determinable with a possibility of reverter in the entire mineral estate, which does not become a possessory right until the lease expires. *Jupiter Oil v. Snow,* 819 S.W.2d 466, 468 (Tex. 1991). The possibility of a reverter under a lease is a separate estate, and just like any other mineral interest or estate, the landowner may then convey his possibility of reverter, or a fraction thereof, to a third party. *Id.* ("Texas courts have long recognized that the owner of a mineral estate can sell or assign the possibility of reverter.").

In earlier times, many landowners labored under the misconception that when they leased their mineral estate to an operator, they only retained 1/8 of the minerals in place, rather than a fee simple determinable with the possibility of reverter in the entirety of the mineral estate (*i.e.*, in 8/8 of the mineral estate). *Hysaw,* 483 S.W.3d at 10. Therefore, when the landowner conveyed a mineral interest to a third party in land that was already subject to a lease, he would often use a fraction of 1/8 to express what interest he intended to convey in his possibility of reverter. *See id.* ("For example, a lessor who has leased the entire mineral estate, but desires to sell-one half [sic] of the minerals, would assume that he owned 1/8 of the minerals due to the existing lease . . . [and] would use the fraction 1/16, or a double fraction, 1/2 of 1/8, to convey 1/2 of what he perceived he owned."). Since a landowner in reality retains a full 8/8 interest in the reverter, the application of the estate misconception doctrine has tremendous consequences. Under this example, if the grantee is only given a 1/16 mineral interest, he or she only receives 1/16 of any royalty set under a lease; however, if the grantee is given 1/2 of the entire mineral estate in the reverter, he owns a full 1/2 of the mineral interests, and would therefore be entitled to a full 1/2 of any royalty owed

12

under any future lease.  *Id.*

Despite discussing these various doctrines that may be applied when interpreting mineral deeds containing conflicting or double fractions, the Court in *Hysaw* noted that there are simply no "bright-line" rules or "mechanically applied, mathematical approach[es]," that may be universally applied in interpreting deeds of this nature.   Therefore, although the "estate-misconception theory and the historical use of 1/8 as the standard royalty may inform the meaning of fractions stated in multiples of 1/8 . . . these considerations are not alone dispositive[,]" and instead the focus should be on the parties' intent when interpreting a deed.    *Hysaw,* 483 S.W.3d at 12-13.

## The Parties' Arguments in the Trial Court

In the trial court, the Borden Successors argued that the 1927 deed gave Borden (and therefore his successors) a single grant of a floating 1/2 royalty interest, meaning that they were entitled to 1/2 of any royalty provided for in *any* lease on the land, including both the now-expired Ross Lease and the current Patriot Leases.   Therefore, under the Ross Lease, Borden and his successors would have been entitled to a 1/2 interest in the 1/8 royalty interest set forth in that lease, which would have resulted in giving them a 1/16 share of the total production.   But using this same analysis, the Borden Successors would be entitled to a 1/2 interest in the 1/4 royalty set forth in the existing Patriot Leases, which would result in giving them a 1/8 share of the total production.

The Eddins Successors, which broke into two main groups, the Wolf Bone Ranch Group ("Wolf Bone") and the Greer Group, however, argued that the 1927 deed conveyed two separate and distinct estates to Borden, one temporary and one permanent.   First, in agreement with the Borden Successors, they posited that Borden was entitled to a 1/2 royalty interest under the Ross

13

Lease, giving Borden and his successors a 1/16 share of the total production under that lease. However, the Eddins Successors argued that this was a temporary estate that expired when the Ross Lease expired. The Eddins Successors argued that when this temporary estate expired, a second estate arose, which they posited took one of two possible forms. They described the first possible remaining estate as a perpetual undivided 1/16 mineral interest in the lands, stripped of the executive rights to lease the land, which would have given the Borden Successors a 1/16 interest in the 1/4 royalty under the Patriot Leases, resulting in a 1/64 share in the total production under those leases. They described the second possible remaining estate as a fixed 1/16 nonparticipating fixed royalty interest, which would have entitled the Borden Successors to a larger 1/16 share of the total production on the land under any lease regardless of the size of the royalty interest set forth in the lease.[2]

## The Trial Court's Decision

The trial court agreed with the Borden Successors' position that the 1927 deed conveyed a 1/2 floating royalty interest to Borden, which under the 1/4 royalty interest set by the Patriot Leases gave the Borden Successors the right to receive a 1/8 interest in the total production under that lease. The trial court therefore granted the Borden Successors' motions and denied the Eddins Successors' cross-motions.

The trial court certified the case for a permissive interlocutory appeal finding that an immediate appeal would materially advance the ultimate termination of the litigation. *See* TEX. R. CIV. P. 168; TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (West Supp. 2016); TEX. R. APP. P.

---

[2] Wolf Bone made these arguments in a cross-motion for partial summary judgment in which the Greer Group joined. However, the Greer Group also filed its own claim for declaratory relief, seeking a declaration that the Borden Successors were only entitled to a 1/64 share of the total production under the Patriot Leases, as advocated in the second alternative in the Wolf Bone's cross-motion for partial summary judgment. Several of the other Eddins Successors joined in the Greer Group's claim for declaratory relief.

14

28.3.   The court described the two "controlling questions of law as to which there is a substantial ground for difference of opinion regarding the nature and size of the oil and gas interests conveyed" as follows:

1.  Whether the deed conveys a single grant of a floating 1/2 of the royalty interest, as this Court has concluded, or, as the successors to Lynn Eddins contend, two grants consisting of 1/2 of the royalty interest in the land subject to an oil and gas lease at the time of the grant, and a fixed perpetual 1/16th mineral interest?

2.  Whether the deed conveys a single grant of a floating 1/2 of the royalty interest, as this Court has concluded, or, as the successors to Lynn Eddins alternatively contend, a fixed 1/16th royalty interest?

This Court subsequently granted the parties the right to pursue this permissive appeal.

## DISCUSSION

In a single issue on appeal, the Eddins Successors contend the trial court erred in its interpretation of the 1927 deed when it granted the Borden Successors a floating 1/2 royalty interest under the current lease.

### Standard of Review

The sole issue in this appeal centers on deed construction, which is a question of law we review de novo. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *see also Chesapeake Exploration, L.L.C. v. Energen Res. Corp.,* 445 S.W.3d 878, 881 (Tex.App. – El Paso 2014, no pet.) (where the trial court's summary judgment concerns the construction of an unambiguous oil and gas lease, the standard of review is de novo).   When conducting a de novo review, we apply our own judgment and accord no deference to the trial court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

In construing a deed, our primary concern is to determine the parties' intent based on the words the parties used within the four corners of the document. *See Hysaw,* 483 S.W.3d at 8

15

(citing *Luckel,* 819 S.W.2d at 461–62); *see also Chesapeake Exploration, LLC,* 445 S.W.3d at 881-82 ("The primary duty of the court in interpreting an oil and gas lease is to ascertain the parties' intent as expressed within the four corners of the lease."). We apply a holistic approach aimed at ascertaining intent from all words and all parts of the conveying instrument. *Hysaw,* 483 S.W.3d at 13; *Luckel,* 819 S.W.2d at 462. We do not isolate a single clause or phrase and give it predominance; rather, we construe all words and phrases together and in context. *Hysaw,* 483 S.W.3d at 13; *Luckel,* 819 S.W.2d at 462. We discern the parties' intent from the deed's language in its entirety, harmonizing and giving effect to all parts of the deed so no provision is rendered meaningless. *Hysaw,* 483 S.W.3d at 13; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless"); *see also Stribling v. Millican DPC Partners, LP,* 458 S.W.3d 17, 20 (Tex. 2015) ("We have long held that '[a]ll parts of a written instrument must be harmonized and given effect if possible'"). Apparent inconsistencies or contradictions must be harmonized, to the extent possible, by construing the document as a whole. *Hysaw,* 483 S.W.3d at 13. The task of determining a grantor's intent is highly case-specific, and a "[v]ariety of outcome should be expected because written instruments must be interpreted in light of the parties' intent as expressed in the entire document." *Id.*

## Analysis

The Eddins Successor groups, Wolf Bone and the Greer Group, present two different approaches on appeal. Although the Borden Successors' ultimate share of total production is the same 1/64 under either approach, the two groups ask us to interpret the 1927 deed differently. Wolf Bone argues for the first alternative, stated in question one as certified by the trial court, that

16

the 1927 deed made two grants to Borden: (1) a temporary estate consisting of 1/2 of the royalty interest set forth in the Ross Lease, which terminated with the expiration of the Ross Lease; and (2) a second estate that arose once the Ross Lease expired consisting of a fixed perpetual 1/16 mineral interest. This interpretation would entitle the Borden Successors to a 1/64 share of the production under the Patriot Leases (*i.e.*, 1/16 of the 1/4 royalty interest set by the leases).[3]

The Greer Group, on the other hand, appears to be making an entirely new argument on appeal—one that is not stated in either of the trial court's two questions—that the Borden Successors should be given a floating 1/16 royalty interest, that is, 1/16 of any royalty interest under any lease on the land, which would give the Borden Successors a 1/64 share of the total production under the Patriot leases (1/16 of the 1/4 royalty under the leases). We find both approaches to be fatally flawed.

### *The Greer Group Fails to Construe the Deed as a Whole*

The Greer Group's argument is focused solely on its interpretation of paragraph 6 in the deed, which the Greer Group refers to as the future lease clause. Paragraph 6 states that when the Ross Lease terminated, "then and in that event an undivided one sixteenth (1/16) of the lease interest and all future rentals on said land for oil, gas and other mineral privileges shall be owned by said Grantee, he owning one sixteenth of all oil, gas and other minerals in and under said lands, together with no interest in all future rents." Pointing out that paragraph 6 only used the fraction "1/16" to explain what interest was to be conveyed to Borden upon the termination of the Ross Lease, the Greer Group contends was a clear indication that the parties intent was to transfer a 1/16 interest to Borden in any future leases. The Greer Group contends that paragraph 6 is the *only*

---

[3] Wolf Bone no longer makes the alternative argument, as stated in Question Two, that the Borden Successors should be given a fixed 1/16 royalty interest, which would have given the Borden Successors 1/16 of the total production under the Patriot Leases.

provision in the deed that we should consider in determining the size of the interest the parties intended to convey to Borden (and thereby the Borden successors) upon the termination of the Ross Lease, and that we should essentially ignore every other provision in the deed as being irrelevant. In particular, the Greer Group points out that Patriot's interpleader lawsuit only asked the court to determine what interest it was obligated to pay to the Borden Successors under the Patriot's Leases, and the Greer Group contends that only the future lease clause (paragraph 6) answers that question. Following this logic, the Greer Group asserts that if we were to consider any other provisions in the deed in determining the Borden Successors' interest in the Patriot Leases, or if we were to decide what other interests or rights the Borden Successors might have under other provisions in the deed, this would constitute an improper "advisory opinion" in which we would be determining issues and interests that are not the subject of the lawsuit and therefore not before the Court. We disagree. The Greer Group's approach to construction of the 1927 deed would be in direct contravention of the Supreme Court's directive on how to interpret mineral deeds.

As explained above, the Supreme Court has repeatedly held that a grantee's future interest—or any other interest—in a mineral deed can only be determined by viewing the deed in its entirety, and by construing each and every provision in the deed and harmonizing any apparent conflicts found in the deed as a whole. *See, e.g., Hysaw,* 483 S.W.3d at 13; *Stribling,* 458 S.W.3d at 20*; Luckel,* 819 S.W.2d at 462; *Coker,* 650 S.W.2d at 393. Further, the Court has expressly warned that it is improper to consider a single clause or phrase in isolation when construing a deed, and that a court must instead attempt to give meaning to all provisions in the deed when possible, without rendering any provision meaningless. *Hysaw,* 483 S.W.3d at 13; *Stribling,* 458 S.W.3d at

18

20*; Italian Cowboy Partners, Ltd.,* 341 S.W.3d at 333; *Luckel,* 819 S.W.2d at 462; *Coker,* 650 S.W.2d at 393; *Anadarko Petroleum Corp.,* 94 S.W.3d at 554 (court must presume that the parties to a lease intended that every clause in the lease was to have some effect).

Moreover, none of the cases cited by the Greer Group support the proposition that a court should only look to a future lease clause when determining a grantee's interest in a deed—even if, as in the present case, the grantee's interest in a future lease is the only question under consideration by the court. In fact, in *Garrett v. Dils*, the Court reached an opposite conclusion. 299 S.W.2d at 906. Although the "immediate" question before the Court centered on the amount of the royalty a grantee was to be paid under a lease that was not in existence when a deed was signed, the Court noted that this question could only be answered by determining what interest the grantee had in the lease that was in existence when the parties first entered into the deed, and looked to the entirety of the deed in "determining from the language of the deed whether it was the intention of the parties that the royalty was to be the same under subsequent leases." *Id.* Similarly, in virtually every other case cited by the Greer Group, the courts determined the size and nature of a grantee's interest in a future lease by looking not only to a deed's future lease clause, but by considering and harmonizing every other provision in the deed in order to determine exactly what the grantor intended to convey to the grantee, both in terms of existing as well as future leases.[4] *See, e.g., Concord Oil Co.*, 966 S.W.2d at 458 (in determining grantee's interest in a

---

[4] The Greer Group correctly point outs that in determining the parties' interest under an *existing* lease, the Court in *Richardson v. Hart,* 185 S.W.2d 563, 565 (Tex. 1945), did not also purport to determine what interest, if any, the parties might have under *future* leases, as that issue had not been presented for its consideration. However, the Court did look to virtually every other paragraph in the deed in determining that interest. *Id.* at 564-65. Further, that the Supreme Court, in one isolated case, may have declined to consider one of the provisions in a deed in determining a grantee's interest, cannot serve as basis for the Greer Group's argument that a court should construe deed provisions in in isolation, because virtually every other Supreme Court opinion, including the Court's most recent opinion in *Hysaw*, have all clearly and unequivocally adhered to the doctrine that in determining the grantor's intent, every provision in a deed must be considered and that provisions must not be construed in isolation. *See, e.g., Hysaw,* 483

future lease, the Court reviewed the parties' deed as a whole to determine the nature of the interests the grantor intended to convey in both existing and future leases); *Luckel,* 819 S.W.2d at 462 (court considered the "actual intent of the parties as expressed in the instrument as a whole" in determining the grantee's interests in both existing and future leases); *Jupiter Oil,* 819 S.W.2d at 468-69 (in determining the grantee's interest in a future lease, the court did not limit its consideration to the deed's future lease clause, and instead looked to all provisions in the deed, harmonizing seemingly conflicting provisions, in an attempt to ascertain the grantor's intent).

As such, we must look to all of the provisions in the 1927 deed and attempt to harmonize those provisions in determining exactly what Eddins intended to convey to Borden in the 1927 deed, and this analysis must include a discussion of Borden's interest in both the existing Ross Lease and any future leases, as well as the general nature and scope of any other interests conveyed to Borden in the deed.[5]

### The Deed Conveyed More Than a Royalty Interest

Both Wolf Bone and the Borden Successors appear to agree that the 1927 deed conveyed to Borden a 1/2 royalty interest in the then-existing Ross Lease. However, that is where their agreement stops. The Borden Successors argue that no mineral estate was conveyed in the deed, and that instead, the only conveyance under the deed was a 1/2 floating royalty interest, which was applicable to both the existing lease (*i.e.*, the Ross Lease) and all future leases (*i.e.*, the Patriot Leases). Wolf Bone, on the other hand, contends, in essence, that two estates were conveyed to

---

S.W.3d at 13.

[5] We also note, as discussed below, that paragraph 6 is replete with language indicating that Borden was to be left with a 1/16 *mineral* interest in the land upon the expiration of the Ross Lease, undercutting the Greer Group's argument that paragraph 6 left Borden with only a 1/16 *royalty* interest.

Borden, one of which was a temporary 1/2 *royalty* interest under the Ross Lease, which ended with the termination of that lease, and a separate 1/16 *mineral* interest that arose upon the expiration of the Ross Lease.

We consider the Borden Successors' argument first. The Borden Successors contend that no mineral interest was conveyed by the 1927 deed, and that the only interest conveyed was a royalty interest.[6] They point out that paragraphs 4 and 5 of the deed both contain references to a royalty interest. In particular, they note that paragraph 5 refers to the 1/2 royalty interest that Borden was given under the Ross Lease, and that paragraph 4 states, among other things, that Borden was purchasing 1/2 of Eddins' "royalty" interest. The Borden Successors' argument, however, overlooks that in paragraph 4, the deed also indicates that Borden was purchasing 1/2 of the "minerals, produced in and from wells or other operations situated on the specific tract of land described in this instrument[,]" which the Supreme Court has recognized is the clear language of a mineral interest conveyance. *See, e.g., Concord Oil Co.*, 966 S.W.2d at 453, 459 (holding that language in a deed conveying an "interest in and to all of the . . . minerals in and under, and that may be produced," is clearly indicative of a mineral interest); *French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 796, 798 (Tex. 1995) (language conveying an "interest in and to all of the oil, gas and other minerals, in, under and that may be produced from the following described lands" was clearly that of a mineral interest); *Richardson*, 185 S.W.2d at 564-65 (construing similar language to connote a mineral interest); *see also Garza,* 195 S.W.3d at 142-43 (the phrase "in and under" refers to a mineral interest) (citing Laura H. Burney, *Interpreting Mineral and Royalty Deeds: The*

---

[6] At various times in their brief, the Borden Successors indicate that, although they are disclaiming any right to a mineral interest, they have no objection to the court *also* finding that a mineral interest was conveyed by the deed, in addition to a royalty interest, but only if the court were to find it to be a 1/2 mineral interest and not the 1/16 interest argued for by the Eddins Successors.

*Legacy of the One–Eighth Royalty and Other Stories,* 33 St. Mary's L.J. 1, 30–31 (2001)).

Similarly, the Borden Successors' argument would have us focus on only those two references to a royalty interest in paragraphs 4 and 5 and have us overlook virtually every other provision in the deed, which is contrary to Supreme Court precedent. In particular, the Borden Successors would have us overlook paragraph 1, which purports to grant to Borden an interest "in and to all of the oil, gas and other minerals in and under, and that may be produced" on the land, which again, is classic language of a mineral interest. Similarly, the Borden Successors would have us overlook paragraph 3, which purports to give Borden "the right of ingress and egress at all times for the purpose of mining, drilling, and exploring said land for oil, gas and other minerals, and removing the same therefrom." As the Supreme Court has recognized, a conveyance purporting to transfer to a grantee the right of ingress and egress for the purpose of mining, drilling and exploring is by definition a mineral interest rather than a royalty interest. In particular, the Court has noted that such language is possessory in nature, and that royalty interests are by definition non-possessory in nature, and that therefore, a grantee holding only a royalty interest would not be given that right. *See, e.g., Concord Oil Co.,* 966 S.W.2d at 459 (rights of ingress and egress and the right to develop the mineral estate is "classic language used in granting an interest in minerals"); *see also Prairie Producing Co. v. Schlachter*, 786 S.W.2d 409, 412 (Tex. App. – Texarkana 1990, writ denied) (a royalty owner has no right to explore and drill).

The Borden Successors nevertheless argue that we should essentially overlook this language denoting the conveyance of a mineral interest, in favor of the two references made in the deed to the conveyance of a royalty interest. However, the cases cited by the Borden Successors for this proposition belie their argument, and suggest that we may *not* simply overlook the

22

language in the deed indicating that a mineral interest was being conveyed, and that we must instead construe the deed as a whole in order to give effect to the grantor's intent. *See, e.g., Watkins v. Slaughter*, 183 S.W.2d 474, 475, 477 (Tex.Civ.App. – Amarillo 1944), *aff'd*, 144 Tex. 179, 189 S.W.2d 699 (1945) (deed was construed to reserve a 1/16 royalty interest, where the deed initially stated it was conveying an undivided fifteen-sixteenths interest in "all the oil, gas and other minerals in and under and that may be produced from said land and the grantor retains title to a 1/16 interest in and to all of the oil, gas and other minerals in and under and that may be produced from said land," but later expressly referred to the grantor's reserved interest as being a royalty); *Temple-Inland Forest Prods. Corp. v. Henderson Family P'ship,* Ltd., 958 S.W.2d 183, 185-86 (Tex. 1997) (similar deed was construed to reserve a 1/16 royalty interest, where the deed initially conveyed an undivided fifteen-sixteenths interest in "all of the oil, gas and other minerals . . . that may be produced," but later expressly referred to the grantor's reserved interest as being a royalty).

Unlike the cases cited by the Borden Successors, in the present case, the 1927 deed did not make a mere passing reference to a mineral interest, and instead, the deed is replete with language indicating that Eddins intended to convey a mineral interest—language that is found in almost every provision in the deed. Further, unlike the above cases, the 1927 deed case did not contain any subsequent paragraphs clarifying that the interest to be conveyed was *only* a royalty interest.

Moreover, in addition to the repeated provisions in the deed using the language of a mineral interest, we find it significant that both paragraphs 6 and 7 state that Eddins was reserving certain mineral interests in the land, when he reserved the right to receive "future rentals" under the Ross Lease, and when he stated that Borden was not required to join in the execution of any future leases. Because a royalty interest holder does not have the right to receive any such rentals or the

23

right to execute leases, there would be no reason for Eddins to reserve those mineral rights if in fact he only intended to convey to Borden a royalty interest alone.  *See, e.g., Garza*, 195 S.W.3d at 142 (the court noted that the reservation in a deed of the various attributes of a severed mineral estate would have been "redundant" if only a royalty interest was conveyed); *see also French,* 896 S.W.2d at 798 (a conveyance that reserved various mineral interests, although at times referred to as a royalty interest, would have been redundant and served no purpose if the interests in minerals being conveyed was royalty interest); *see also Bank One, Texas, Nat'l Assoc. v. Alexander,* 910 S.W.2d 530, 535 (Tex.App. – Austin 1995, writ denied) (finding deed reserved a mineral interest because express conveyance of all other mineral interests owned by the grantor would be redundant if deed intended to reserve only a royalty interest).

Further, the only two sentences in the deed that refer to a royalty interest are easily reconciled with the remaining passages in the deed referring to the conveyance of a mineral interest.  Paragraph 5 states that the conveyance is being made subject to the Ross Lease, and that Borden is being given a 1/2 royalty interest in that lease.  We construe that to mean that Eddins intended to express that the mineral interest being conveyed included a concomitant royalty interest in the Ross Lease, a position entirely consistent with the conveyance of a mineral interest. *See, e.g., Concord Oil, Co.,* 966 S.W.2d at 459 (although the granting clause in a deed appeared to convey only a 1/12 royalty interest to grantee, the deed as a whole was construed to give the grantee a 1/12 mineral interest, which *included* the 1/12 royalty interest applicable to all leases on the land).  Further, paragraph 4, while less clear, states that Eddins is the "owner of all of the royalty and that [Borden] is purchasing one-half (1/2) of the royalty [] one half (1/2) of the minerals, produced in and from wells or other operations situated on the specific tract of land

24

described in this instrument." While this provision suffers from a lack of punctuation, in light of the other language used in the deed, we construe it to mean that Eddins intended to convey to Borden a mineral interest, which *included* a corresponding royalty interest.

In short, if we were to agree with the Borden Successors that only a royalty interest was conveyed, we would have to negate all but the two sentences in the deed, and ignore virtually every other provision in the deed referring to the conveyance as being that of a mineral interest. Instead, a construction of the deed that it conveyed both a mineral interest and a royalty interest is the only interpretation that satisfactorily harmonizes and explains each and every provision in the deed, as required by Supreme Court precedent.

We recognize that the Borden Successors may undoubtedly waive their right to assert an interest to any mineral rights under the deed, and may instead ask us to only enter a judgment awarding them any corresponding royalty interest to which they might be entitled under the deed, or in other words, the royalty interest to which they would be entitled as mineral interest owners. However, this does not mean that we can, or should, ignore the repeated references in the deed to the conveyance of a mineral interest to Borden. To the contrary, as explained below, our determination that a mineral interest was conveyed by the deed, together with the size of that interest, will determine the size and type of royalty interest the Borden Successors have under the deed, as the two concepts are inextricably intertwined.

### *The 1927 Deed Conveyed a 1/2 Mineral Estate to Borden*

In order to determine the nature and size of the mineral interest that Eddins conveyed to Borden in the 1927 deed, it is first important to understand exactly what interest Eddins retained in the mineral estate on his land after he executed the Ross Lease, and therefore what interest he was

25

able to convey to Borden after the execution of that lease. As explained above, prior to executing the Ross Lease, Eddins owned 100 percent of the mineral estate on his land, but upon executing the Ross Lease, Eddins conveyed to Ross the right to develop (*i.e.*, the right to explore and drill for minerals on the land), but reserved the following interests: (1) a 1/8 royalty interest in that lease, entitling him to 1/8 of the production on the land; (2) the remainder of the five mineral estate interests not conveyed to Ross (*i.e.*, the executive right to execute leases, and the rights to receive bonus payments and delay rentals); and (3) the possibility of reverter in the entire mineral estate upon the expiration of the Ross Lease. *See Hysaw,* 483 S.W.3d at 10 (the possibility of reverter includes the entire mineral estate); *Jupiter Oil,* 819 S.W.2d at 468.

Wolf Bone contends that Eddins conveyed two separate estates to Borden of unequal size, type, and duration. In particular, Wolf Bone contends that Eddins intended to convey to Borden a temporary 1/2 interest in his reserved 1/8 royalty under the Ross Lease, as evidenced by paragraph 5 in the deed, which Wolf Bone contends was extinguished when the Ross Lease terminated. Second, Wolf Bone contends that Eddins intended to convey to Borden a 1/16 mineral interest in his possibility of reverter under the Ross Lease, as evidenced by the language used in paragraph 6, which expressly states that upon the expiration of that lease, "an undivided one sixteenth (1/16) of the lease interest and all future rentals on said land for oil, gas and other mineral privileges shall be owned by said [Borden], he owning one sixteenth of all oil, gas and other minerals in and under said lands, together with no interest in all future rents." Thus, according to Wolf Bone, upon the expiration of the Ross Lease, this left Borden with a 1/16 mineral interest, which in turn, gave Borden and his successors a corresponding 1/16 floating royalty interest. Wolf Bone contends that this is in effect the only way to reconcile these two conflicting fractions, and to successfully

26

harmonize all provisions in the lease.

Wolf Bone is correct that courts have long held that a grantor may in fact convey two separate estates to a grantee in a mineral deed, which may or may not be of equal size or duration—a concept often referred to as the "two estates" doctrine. Thus, in its most recent opinion on the subject, the Supreme Court in *Hysaw* noted that a grantor could convey, either through the same or separate instruments, an "undivided portion of the mineral estate and a separate royalty interest, and the royalty interest conveyed may be larger or smaller than the interest conveyed in the minerals in place." *Hysaw,* 483 S.W.3d at 9 (citing *Luckel*, 819 S.W.2d at 463); *see also Richardson*, 185 S.W.2d at 564 (construing deed as conveying two separate and distinct estates in the land); *Pan Am. Petroleum Corp. v. Texas Pac. Coal & Oil Co*., 340 S.W.2d 548, 557 (Tex.Civ.App. – El Paso 1960, writ ref'd n.r.e.) (two estates were conveyed when the deed clearly stated that grantees were to be given a temporary 1/4 royalty interest in three existing leases on the property, as well as a permanent 1/32 interest in the mineral estate).

Wolf Bone concludes the deed conveyed two separate estates of unequal sizes by focusing solely on only two provisions in the deed: paragraph 5, which Wolf Bone contends granted Borden the temporary 1/2 royalty interest under the Ross Lease, and paragraph 6, which Wolf Bone contends gave Borden a permanent 1/16 mineral interest in Eddins' possibility of reverter upon the expiration of the Ross Lease. Like the Greer Group's approach, Wolf Bone's approach is flawed by essentially ignoring the language in the five other remaining provisions in the deed. Again, we reject this approach because it contravenes the Supreme Court's mandate that we look to all provisions in a deed in determining the parties' intent in conveying mineral interests.

Importantly, we note that in at least three other provisions in the lease, Eddins used

27

language indicating his intent to make an immediate transfer of a portion of his mineral interests to Borden, and not just in a transfer of his possibility of reverter. First, in paragraph 1 of the deed Eddins states that he was conveying to Borden a 1/16 interest in the "minerals in and under, and that [which] may be produced" from the land described in the deed. This is the classic language of a mineral conveyance, and there is no indication in paragraph 1 that Eddins intended to convey only his future mineral interests in the possibility of reverter in that paragraph. *See, e.g., Concord Oil Co.*, 966 S.W.2d at 459. Similarly, paragraph 3 also appears to convey an immediate mineral interest to Borden, when it states that Borden is to have the "right of ingress and egress at all times for the purpose of mining, drilling, and exploring said land for oil, gas and other minerals, and removing the same therefrom." The Supreme Court has recognized that a conveyance purporting to transfer to a grantee the right of ingress and egress for the purpose of mining, drilling and exploring is by definition a mineral interest rather than a royalty interest. *Id.* There is nothing in the language of paragraph 3 that would lead us to conclude that Eddins intended to convey only a future mineral interest in his possibility of reverter in this paragraph, and it instead appears to be an immediate conveyance of a mineral interest.

The only paragraph that appears to discuss Borden's future interest in the possibility of reverter is found in paragraph 6, which describes the nature of the estate that Borden is to have upon expiration of the Ross Lease. A close examination of paragraph 6 reveals that Eddins was expressing his intent to convey both a portion of his *future* interest in the possibility of reverter to Borden, together with an intent to convey *present* mineral interest to Borden as well. In particular, paragraph 6 contains a sentence with two separate clauses, which appear to be referring to separate estates.

28

The first clause in the sentence is a statement that upon the expiration of the Ross Lease, "an undivided one sixteenth (1/16) of the lease interest and all future rentals on said land for oil, gas and other mineral privileges *shall be owned* by said [Borden] (emphasis added)." As Wolf Bone appears to recognize, this clause conveys a percentage of the possibility of reverter to Borden. However, in the second clause, the deed adds that, "he [Borden] *owning* one sixteenth of all oil, gas and other minerals in and under said lands, together with no interest in all future rents (emphasis added)." This second clause would have been entirely unnecessary and redundant if Eddins only intended to memorialize that he was conveying to Borden a future mineral interest (*i.e.*, an interest in the possibility of reverter), and it appears that Eddins was instead intending to memorialize his intent that he was conveying an immediate mineral interest to Borden as well. This interpretation is strengthened by the fact that the two clauses appear to convey mineral estates that have different attributes. The first clause, which appears to be giving Borden an interest in the future possibility of reverter, includes an interest in "all future rentals," whereas the second clause, which appears to be giving Borden a present mineral interest, states that Borden has "no interest in all future rents." These seemingly conflicting statements can be resolved and harmonized only by concluding that these two clauses conveyed two separate estates to Borden—the future interest in the possibility of reverter (with its inclusion of future rents) and the present mineral interest (without any such inclusion).

Finally, Wolf Bone's interpretation would have us ignore a portion of paragraph 4, which states that Borden was "purchasing one-half (1/2) of the royalty [] *one half (1/2) of the minerals*, produced in and from wells or other operations situated on the specific tract of land described in this instrument [emphasis added]," the latter portion of which utilizes clear language of a mineral

29

conveyance. Wolf Bone argues that this paragraph should be read solely in conjunction with Borden's rights under the Ross Lease, and should be construed as a reiteration that Borden was being given a 1/2 royalty interest in the Ross Lease. This interpretation, however, ignores that paragraph 4 contains references to both a 1/2 royalty interest *and* a 1/2 mineral interest, the latter of which would have no place in discussing a party's royalty interest under a lease. Further, paragraph 4 contains no indication that the interests being discussed in that paragraph were intended to only apply to Borden's interest in the Ross Lease. To the contrary, the sequence in which the two paragraphs are found in the deed belies any such interpretation, because the first mention of the Ross Lease comes in paragraph 5, *after* the discussion of Borden's "purchase" of his mineral interests in paragraph 4. Instead, we conclude that Paragraph 4 was an expression that Borden was purchasing an immediate mineral interest with a corresponding royalty interest, which harmonizes this paragraph with paragraphs 1, 3, 6, and 7 of the deed, as described above. In turn, paragraph 6 not only reiterates that Borden was making an immediate purchase of a mineral interest, but that he also had an interest in Eddins' future possibility of reverter as well. And finally, paragraph 5 is a recognition that the purchase of these various mineral interests is being made subject to the Ross Lease. It is only by interpreting the 1927 deed in this manner, as conveying both a present and future mineral estate to Borden, that we can reconcile every provision in the lease, and thereby harmonize all of those seemingly conflicting provisions in order to ascertain the parties' intent, as we are required to do. *See, e.g., Hysaw,* 483 S.W.3d at 13.

### *Harmonizing the Fractions*

Although the 1927 Deed at various times uses the 1/16 fraction and at other times uses the 1/2 fraction, these seemingly conflicting fractions are readily harmonized by resorting to the

"legacy of the 1/8th royalty" doctrine and the estate misconception doctrine. As explained above, in light of the "ubiquitous" standard 1/8 royalty interest, land owners at the time this deed was executed labored under the mistaken impression that their standard royalty interest would always and forever be a 1/8 interest (*i.e.,* the "legacy of the 1/8th royalty"), and thereby often used the 1/8 fraction and multiples thereof to express the fraction of their interest that they intended to convey to a third party. Similarly, as recognized by the "estate misconception" doctrine, at the time of this conveyance, landowners often labored under the mistaken impression that they only owned a 1/8 mineral interest in the possibility of a reverter under a lease, when in fact the reverter was the equivalent of the entire mineral estate. *See, e.g., Hysaw,* 483 S.W.3d at 10-11. Therefore, grantors during that time period also used "multiples of 1/8" as a shorthand expression to indicate the interest they intended to convey in a possibility of a reverter.

Applying these two doctrines in conjunction, we conclude that Eddins used the fraction 1/16 in paragraphs 1 and 6 as a shorthand for expressing that he intended to convey 1/2 of what he believed was his remaining 1/8 mineral interest in the land, *i.e.*, 1/2 of that purported 1/8 interest. This enables us to harmonize the use of the 1/2 fraction in paragraph 4, which indicated Borden was purchasing a 1/2 mineral interest in the land, which corresponded with the 1/2 floating royalty interest that would directly derive from that mineral interest. *See, e.g., Garrett*, 299 S.W.2d at 906 (where deed used both the 1/16 fraction and the 1/2 fraction as various times, the court concluded that grantor's use of a 1/16 fraction was a shorthand expression of the grantor's intent to convey 1/2 of his 1/8 royalty interest, thereby harmonizing the deed's use of the conflicting fraction in other provisions in the deed); *see also Luckel,* 819 S.W.2d at 462 (court applied the "legacy of the 1/8th royalty" in determining that the 1/32 fraction used in the granting clause of the

deed represented a shorthand way of expressing that grantor intended to convey her 1/4 interest in the "usual" 1/8 royalty retained in oil and gas leases at the time, giving the grantee a 1/4 floating royalty interest, allowing court to harmonize the deed's use of the 1/4 fraction in other provisions in the deed); *Hysaw,* 483 S.W.3d at 15-16 (applying the "legacy of the 1/8th royalty," where grantor conveyed 1/3 of 1/8 of her interests under an existing lease to each of her children in her will, to conclude that she intended to use the fraction 1/8 as a "shorthand" for the entire royalty interest that she retained under the lease, thereby giving each grantee equal shares of her interest).

This interpretation not only harmonizes all of the provisions in the deed, but also is further strengthened by the fact that Borden was given the same size royalty interest under the Ross Lease (an express 1/2 royalty interest), as he was under future leases. We find this to be consistent with Eddins' intent, since there is simply nothing in the 1927 deed to indicate that Eddins intended to give Borden a fairly substantial 1/16 share of production under the Ross Lease (1/2 of his 1/8 royalty), but then significantly reduce that share under any future leases to 1/16 of his 1/8 royalty interest, which would amount to a 1/96 share of production. Such a radical change in the interest being conveyed would not be expected in a conveyance of this nature. Therefore, we decline to adopt such an interpretation of the 1927 deed. *See, e.g., Garrett,* 299 S.W.2d at 906-07 (finding nothing in the language of the deed that would warrant a conclusion that the grantor intended to reduce the grantee's existing royalty interest in future leases from what he conveyed under an existing lease).

We therefore conclude that Eddins intended to convey one estate to Borden, consisting of a permanent 1/2 mineral interest, existing both before and after the expiration of the Ross Lease, which included a corresponding 1/2 floating royalty interest in both existing and future leases.

*See, e.g., Concord Oil Co.*, 966 S.W.2d at 457 (finding that the grantor intended to convey one estate, consisting of a 1/2 mineral interest, which included a 1/2 royalty interest).  Although we arrive at this conclusion based on a different analysis than used by the parties or the trial court, the answer to the trial court's certified question is the same—the Borden Successors have a floating 1/2 royalty interest under the terms of the 1927 deed (derived from their 1/2 mineral interest), which in turn entitles them to 1/2 of the 1/4 royalty set by the Patriot Leases, or in other words, a 1/8 share of the total production under those leases.   We overrule the single issue on appeal.

## CONCLUSION

The trial court's judgment is affirmed.


STEVEN L. HUGHES, Justice

October 19, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.